■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANNY ROBINSON, Also Known as BRUNCE SMITH, Appellant.—Judgment of the Supreme Court, Bronx County (Elbert Hinkson, J., at *Mapp* hearings, plea and sentence), rendered February 28, 1984, which convicted defendant, upon his plea of guilty, of attempted criminal possession of a controlled substance in the fourth degree and sentenced him as a second felony offender to an indeterminate sentence of from 2 to 4 years' imprisonment, is reversed, on the law, defendant's motion to suppress evidence granted and the indictment dismissed.

By decision dated March 25, 1986 (118 AD2d 516), we reversed the denial of defendant's motion to suppress evidence and held this appeal in abeyance, pending a reopened *Mapp* hearing to permit defendant broader cross-examination of the police officers who arrested him and production of the drugs seized and the officers' memo book entries on the arrest. The reopened hearing was held on August 5, 1986, before Justice Hinkson, and on August 11, 1986, the court adhered to its original decision to deny defendant's motion to suppress. On remand to this court, we now determine the merits of defendant's suppression motion and conclude that defendant's motion to suppress the drugs seized should be granted, his judgment of conviction vacated and the indictment dismissed.

Except for the more specific testimony as to the configuration of the package of drugs seized, as will be discussed below, most of the testimony relevant to this appeal was adduced at the first hearing held January 24 to 31, 1984, and will now be summarized.

On August 3, 1983, while on radio motor patrol, Police Officers Vincent Lopane and Sal Lifriere were stopped by fellow Officer George Wallace, who advised them to be on the lookout for a tall black man, about 6 to 6 feet, 2 inches in height, with a medium build and dark clothes, who had the

butt of a gun protruding from his waistband and a bulge in the crotch area, apparently due to the gun having been holstered to a jockstrap. Wallace had seen the man in the vicinity of 170th Street and College Avenue in The Bronx, and after pursuing the man, lost him. Wallace never reported this incident to the precinct and never noted it in his memo book.

Three and one-quarter hours later, while in the area where the man with the gun had reportedly been seen, Lopane and Lifriere spotted defendant, who matched the earlier description, and ordered him to halt. Defendant did so. When defendant faced Lopane, the officer could see a bulge in defendant's crotch. When specifically asked if he could see the outline of a gun, Lopane merely repeated that he saw a bulge. He admitted, however, to never seeing the butt of a gun protruding from the waist of defendant's pants. Lopane also testified that he "didn't wait that long to see what outline it [the bulge] made". He simply drew his gun, ordered defendant to get up against the wall and patted him down. Lopane felt a hard object and inquired of defendant whether it was a gun. Defendant answered that he did not carry a gun. Although acknowledging that he "did not know what it felt like at the time he grabbed [the bulge]", Lopane, nevertheless, without making further inquiry, reached into defendant's pants and removed 59 tinfoils of cocaine and 12 glassine envelopes of heroin.

At the reopened hearing, the drugs were produced. At counsel's request, Lopane recreated as best he could the shape of the package that he seized from defendant's jockstrap. Lopane testified that all the packets of drugs were in a plastic wrapper except for four or five tinfoils of heroin which lay loose in defendant's jockstrap. The 12 glassine packets were positioned on top of each other forming a one-inch by two-inch packet with a depth of half an inch. Next to the glassines were the tinfoils, forming a packet that measured approximately three inches by three inches, with a depth of two inches. Lopane stated that when he patted defendant down he was able to squeeze the entire package which bulged from the jockstrap. The officers' memo book entries, which were produced at the reopened hearing, contained no notes on the configuration or hardness of the bulge and no notes about the conversation with Officer Wallace.

Counsel for the defense argued that no matter what the exact configuration of the bulge was, it could not have looked or felt like a gun, and, thus, did not justify Lopane's search of defendant's pants. The People argued that no new facts were

elicited which should alter the court's ruling. The court adhered to its decision to deny defendant's motion. We reverse.

It is well recognized that a police officer, who has stopped a person based on a reasonable suspicion of criminality and has reason to believe he is dealing with an armed and dangerous individual, may conduct a protective search for weapons of that person. *(Terry v Ohio,* 392 US 1, 27; *People v De Bour,* 40 NY2d 210, 223.) Because the justification for such a search is a protective one, unlike a search incident to a lawful arrest, which is justified by a need to prevent the disappearance or destruction of evidence of a crime, a protective search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *(Terry v Ohio, supra,* at p 29.) A reasonable intrusion generally takes the form of a patdown of the detained person's outer clothing to determine the existence of any weapons. Once that limited intrusion fails to reveal a weapon and the basis for the officer's fear for his safety has therefore abated, the search must stop. *(People v Roth,* 66 NY2d 688, 690; *People v McGriff,* 99 AD2d 818, 819.)

According to decisional law, in instances where a visual observation or a limited protective frisk of the detainee reveals a bulge, that bulge must look or feel like a weapon before the officer is entitled to subject the detainee to a further and more intrusive search. Thus, in *Terry v Ohio (supra,* pp 29-30), the seminal "stop-and-frisk" case, the officer's more intrusive step of reaching into the defendant's pockets, which did not take place until after the officer actually "felt weapons", was a warranted intrusion in order to actually remove a gun and was not a general search for guns.

The facts in *People v Sanchez* (38 NY2d 72) stand in contrast to those in *Terry v Ohio (supra)* and are illustrative of a search that was unjustified as a protective search for weapons. There, the police officers were in the course of stopping and disarming a man with a knife. When defendant, who was several steps away from the armed man, began to walk away, an officer said "hold it", and as he reached out his hand he touched a "hard object" in defendant's jacket pocket. He immediately placed defendant against the wall and searched defendant's pocket, seizing a blackjack. *(People v Sanchez, supra,* at p 74.) The *Sanchez* court ruled that without evidence that what the officer accidentally touched "was or felt like a weapon" and without information linking defendant to possession of a weapon, the search was unjustified. *(Supra,* at p 75.)

Another case in point is *People v McGriff* (99 AD2d 818, *supra*). In *McGriff*, a police officer, after observing a bulge in the pouch of defendant's jacket, felt the bulge and, believing it to be "envelopes", reached in and retrieved heroin. The court suppressed the evidence seized, stating that "once the police officer knew that the bulge was not a weapon, he had no right to continue the search by reaching into the pocket of defendant's jacket [citations omitted]." *(Supra,* at p 819.)

Application of the above principles to the instant facts requires suppression of the drugs. Upon seeing defendant, who matched the general description given over three hours earlier by a fellow officer of a man with the butt of a gun protruding from his waistband, Officer Lopane was justified in stopping defendant and frisking him based on the fellow officer's report and his own observations of a bulge in defendant's crotch. In frisking defendant, Lopane felt the bulge, which he described as hard. However, he also testified that he could squeeze the bulge. Lopane additionally could not state that he ever saw the outline of a gun. He definitely did not see the butt of a gun protruding from defendant's waistband, contrary to the report of Officer Wallace, who clearly saw the butt of a gun. More importantly, Lopane never testified that he could feel the outline of a gun upon frisking defendant. Lopane was unable to conclude that what he saw and felt was any kind of a weapon.

That such should be the case is not at all surprising, for we find it manifestly unreasonable that a police officer, experienced in handling guns and other weapons, could possibly mistake a bulge for a gun when the bulge admittedly was not shaped like a gun and could even be squeezed. The feel of a gun is unmistakable. It certainly cannot be squeezed. Had defendant had a gun holstered in his jockstrap, it is more than reasonable to assume that during a patdown the officer would have felt the gun's outline. The bulge was also not large enough to permit the speculation that it could have been a gun wrapped in some type of material. The bulge consisted of two piles of packaged narcotics, one pile measuring an inch by two inches, and another pile, next to the first, measuring three inches by three inches. These square-shaped, squeezable packages could under no reasonable view of the evidence have been a weapon. Lopane, therefore, could no longer have been in reasonable fear of his safety when he touched the bulge, and he was not justified in conducting the more intrusive search of defendant's pants. Accordingly, we reverse the conviction, grant defendant's motion to suppress the drugs seized

and dismiss the indictment. Concur—Sullivan, Carro, Fein and Ellerin, JJ.

Kupferman, J. P., dissents in a memorandum as follows: If one accepts, as the hearing court did (and we have no basis for concluding otherwise), the information given by fellow Officer Wallace, Officer Lopane was fully justified in reaching into the defendant's trousers to see what the hard object was.

We held the appeal in abeyance pending a reopened *Mapp* hearing in order to permit the defendant a broader inquiry. It served no purpose to do this unless we had tentatively determined that suppression was not warranted on the evidence before us, and we were giving the defendant a further opportunity to substantiate the contention of unlawful intrusion.

Upon the reopened hearing, the court stated that it "finds no reason to overturn its original findings of fact and conclusions of law." I concur with the hearing court.

(Republished)